IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| JONATHAN O. HAFEN, as Court-appointed Receiver,<br><br>Plaintiff,<br><br>vs.<br><br>WALTER EVANS, NYLA EVANS, and MICHAEL WILLIAMS<br>Defendants. | ORDER AND MEMORANDUM DECISION<br><br>Case No. 2:19-cv-00895-TC<br><br>Judge Tena Campbell |

In this ancillary action to <u>Commodity Futures Trading Commission et al v. Rust Rare Coin et al</u>, 2:18-cv-00892-TC-DBP, Plaintiff Jonathan O. Hafen (the Receiver) moves the court for partial summary judgment. For the reasons set forth below, the court grants the Receiver's motion (ECF No. 30) in part and denies it in part.

### FACTUAL AND PROCEDURAL BACKGROUND

On November 13, 2018, the Commodity Futures Trading Commission ("CFTC") and the Utah Division of Securities ("UDOS") initiated a civil enforcement action against Rust Rare Coin, Inc. ("RRC"), Gaylen Dean Rust, and affiliated individuals and entities (collectively, the "Receivership Defendants"). <u>Commodity Futures Trading Commission v. Rust Rare Coin, Inc.</u>, Civil No. 2:18-cv-00892-TC-DBP (D. Utah Nov. 13, 2018) (ECF No. 1) (the "Enforcement Action"). The CFTC and UDOS alleged that the Receivership Defendants contrived a silver investment opportunity (the "Silver Pool") through which Receivership Defendants purported to generate returns for investors through the buying and selling of physical silver. The CFTC and

1

UDOS also alleged that—rather than a legitimate investment opportunity—the Silver Pool was a Ponzi scheme.

The court appointed Mr. Hafen as Receiver for the assets of the Receivership Defendants. (See Enforcement Action, (ECF Nos. 22, 54).) The Receiver was charged with, among other things, investigating the financial and business affairs of Receivership Defendants and recovering all assets of the Receivership Estate.

The Receiver initiated the present ancillary action to recover funds transferred to Defendants by Receivership Defendants. (See Compl. (ECF No. 2).) On May 14, 2021, the Receiver filed a partial motion for summary judgment, asking the court to make three findings: (1) that the Receivership Defendants operated the Silver Pool investment scheme since at least 2008; (2) that the Silver Pool operated not as a legitimate investment opportunity but instead as a classic Ponzi scheme; (3) and that Defendants Nyla Evans, Walter Evans, and Michael Williams received money and precious metals from RRC in excess of the amount they invested, as follows:

- Nyla and Walter Evans made payments to RRC totaling $152,267.79;
- Nyla and Walter Evans received cash from RRC totaling $150,778.69;
- Nyla and Walter Evans received 6,270 Silver Eagle coins from RRC with a value of $131,356.50; and
- Mr. Williams made no payments to RRC and received $46,417.08 from RRC totaling.

(See Mot. for Partial Summ. J. at 2 (ECF No. 30).)

As exhibits in support of his motion, the Receiver submitted his own expert declaration (Hafen Decl.), as well as expert reports from Jeffrey T. Shaw (Shaw Decl.), D. Ray Strong

(Strong Report), and Ian Russel (Russel Decl.). The experts were retained to assist with the investigation and administration of the Receivership estate.

Mr. Hafen's declaration incorporated and relied upon an attached report (the Receiver's Report), which was issued in the Enforcement Action. The Receiver's Report details Mr. Hafen's extensive investigation into the business operations and financial condition of Receivership Defendants and summarizes the key findings of that investigation. Attached to the Receiver's report are hundreds of pages of exhibits and appendices containing the documents on which Mr. Hafen bases his conclusions. These exhibits and appendices were filed under seal in the Enforcement Action, but they were not filed in the present case in order to avoid the filing of duplicative voluminous exhibits in all of the ancillary lawsuits to the Enforcement Action. The Receiver did produce these materials to Defendants on a hard disc and through an online database. (See Pl.'s Reply Ex. H (ECF No. 35-1).)

Defendants also retained an expert, Brett Johnson, and submitted his expert report (Johnson Report) in opposition to the Receivers' motion. In his report, Mr. Johnson examined the Mr. Strong and Mr. Shaw's calculations and opinions.

## DISCUSSION

I.  **Summary Judgment Standard**

Summary judgment is appropriate "when there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law." Lints v. Graco Fluid Handling (A) Inc., 347 F. Supp. 3d 990, 1002 (D. Utah 2018); FED. R. CIV. P. 56(a). In applying this standard, the Court "view[s] the factual record and draw[s] all reasonable inferences therefrom most favorably to the nonmovant." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).

## II.  Ponzi Schemes in the Context of Utah's Uniform Voidable Transactions Act

Under Utah law, a transfer is voidable under the Act "if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." Utah Code § 25-6-202(1)(a). The Act allows a creditor to obtain "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." Id. § 25-6-303(1)(a); see also id. § 25-6-304(2)(a) ("[T]o the extent a transfer is avoidable in an action by a creditor under Subsection 25-6-303(1)(a), . . . the creditor may recover judgment for the value of the asset transferred.").

In the context of a Ponzi scheme, this court has stated that "the mere existence of a Ponzi scheme is sufficient to establish a defendant's actual intent to defraud." Klein v. Nelson, No. 2:13-cv-497-TC, 2015 WL 4545748, at *2 (D. Utah July 28, 2015); see also Wing v. Dockstader, 482 F. App'x 361, 363 (10th Cir. 2012) (same); In re Indep. Clearing House, 77 B.R. 843, 860 (D. Utah 1987) ("One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible."). "[A] receiver of an entity which was used to perpetrate a Ponzi scheme has standing to recover fraudulent transfers as though the receiver were a creditor of the scheme." Dockstader, 482 F. App'x at 363, adopting the reasoning of Scholes v. Lehmann, 56 F.3d 750, 753–55 (7th Cir. 1995).

Once a plaintiff establishes that the debtor operated as a Ponzi scheme, all transfers by the debtor entity are presumptively fraudulent and are subject to avoidance. See Nelson, 2015 WL 4545747, at *2. The recipient of funds from the Ponzi scheme then bears the burden of demonstrating that (1) the funds were received in good faith and (2) in exchange for reasonably equivalent value. See Klein v. King & King & Jones, P.C., No. 2:12-CV-00051, 2013 WL 4498831, at *2 (D. Utah Aug. 19, 2013). "It is well established that an investor in a Ponzi

4

scheme does not exchange reasonably equivalent value for payments which exceed the investor's investments." Miller v. Wulf, 84 F. Supp. 3d 1266, 1274 (D. Utah 2015); see also Donell v. Kowell, 533 F.3d 762, 777 (9th Cir. 2008) (finding that amounts above "the innocent investor's initial outlay . . . are merely used to keep the fraud going by giving the false impression that the scheme is a profitable, legitimate business," and "[t]hese amounts are not a 'reasonably equivalent' exchange for the defrauded investor's initial outlay"); Scholes v. Ames, 850 F. Supp. 707, 715 (N.D. Ill. 1994) ("A profit is not offset by anything . . . The paying out of profits to [investor] not offset by further investments by him conferred no benefit on the corporations but merely depleted their resources faster."). Accordingly, if the Receiver can establish that the Silver Pool operated as a Ponzi scheme, funds received by investors in excess of their principal investment—i.e., an investor's "profits" from the scheme—must be returned to the Receivership estate if they were not received in exchange for reasonably equivalent value.

A Ponzi scheme is "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments." Jobin v. McKay, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996); accord S.E.C. v. Management Solutions, Inc., No. 2:11-cv-1165-BSJ, 2013 WL 4501088, at *19 (D. Utah Aug. 22, 2013). "In order to show that an investment scheme falls within the definition of a Ponzi scheme, the Receiver must prove by a preponderance of the evidence the *sine qua non* of a Ponzi scheme: that returns to earlier investors were paid by funds from later investors." Management Solutions, 2013 WL 4501088, at *19.[1]

---

[1] Although an investment opportunity qualifies as a Ponzi scheme if newly invested funds are used to pay existing investors, certain other characteristics are also typically found in Ponzi schemes: promises of substantial, consistent returns; representations that the investment involves little or no risk; payment of substantial returns for at least some time as an enticement to attract new investors; and representations that the investment is secret, exclusive, and/or highly

5

### III. The Silver Pool Operated as a Ponzi Scheme Since at Least 2008.

The evidence in support of the Receiver's motion establishes that Receivership Defendants operated the Silver Pool as a Ponzi scheme. Since at least 2008, Receivership Defendants solicited funds from investors by representing that they would use such funds to trade physical silver, thereby generating returns for investors. (Hafen Decl. ¶ 13; Ex. 1.) Specifically, Receivership Defendants represented that one-half of invested funds would be used to purchase physical silver, which would be stored at Brink's facilities.[2] The remaining one-half of the invested funds would allegedly be used to buy and sell physical silver on the commodities market, increasing the investor's silver holdings over time and generating returns on the investment. (Hafen Decl. ¶ 13.)

In reality, investor funds were not used to purchase physical silver. (Id. ¶ 14.) Gaylen Rust admitted that new investor funds were used to pay returns to existing investors and to fund other businesses that were unrelated to the Silver Pool. (Id. ¶ 15; see also Strong Report at 13–15.)

Although Receivership Defendants represented that they managed over $80 million of physical silver and that approximately one-half of that amount was stored at Brink's locations in Salt Lake City and Los Angeles, there is no evidence that Receivership Defendants ever stored significant amounts of physical silver at Brink's or any other facility. (Hafen Decl. ¶ 19.) Indeed,

---

complex. Management Solutions, 2013 WL 4501088, at *19. Ponzi schemes are also, by definition, insolvent from the beginning. Id.; Klein v. Cornelius, 786 F.3d 1310, 1320 (10th Cir. 2015) ("Ponzi schemes are insolvent by definition . . . .").
[2] Brink's Global Services U.S.A. Inc. ("Brink's") is a large, well-known, and respected private security and protection company that provides armored transportation and highly secured storage services. (Strong Report at 7 n.18)

when questioned by the FBI, Mr. Rust admitted that no significant stores of physical silver existed and that his statements to investors were "all lies."[3] (Receiver's Report, Ex. C at 62:10–15; Ex. F at 25:4–11). The Receiver's investigation also revealed no payments associated with the storage of large quantities of physical silver in secure facilities, which would have constituted an expense of more than $100,000 per year if Mr. Rust's representations had been true. (Id. at 13 & Ex. G).

The Receiver also discovered that millions of dollars of investor funds were diverted to other business entities that were unrelated to any silver trading. (Id. at 13). For example, R Legacy Entertainment, LLC ("RLE") operated a variety of entertainment businesses and received more than $22 million from Receivership Defendants, often from funds traceable to investors in the Silver Pool. (Strong Decl. ¶ 104 and related chart). Other affiliated businesses included a horseracing and breeding operation and a company holding certain real property. (Id.). In total, these affiliated businesses received more than $30 million from accounts containing investor funds. (Id.).

It is clear that Receivership Defendants did not trade physical silver in the manner represented to investors. In interviews with the FBI, Mr. Rust expressly admitted that he had used newly invested funds to pay returns to existing investors in the Silver Pool:

> **SA Malpede:** Were you utilizing new investor money . . . to pay old investors back?
>
> **Rust:** Sometimes . . . .
>
> **SA Malpede:** Okay. Is that not the definition of a Ponzi scheme?
>
> **Rust:** I guess, yes.

---

[3] In support of the motion, the Receiver submitted transcripts of interviews between Mr. Rust and investigators from the FBI and CFTC. In these interviews, Mr. Rust made a number of key admissions.

. . .

**SA Malpede:** But the reality is that the payments that you're making to these people are truly coming from essentially Ponzi payments. Is that—is that a fair statement?

**Rust:** That is a fair statement, probably.

(Receiver's Report at 15 & Ex. F at 11:8–18; 24:13–18).

Consistent with Mr. Rust's admissions to investigators, Mr. Strong's analysis revealed that payments made to investors could only have been obtained from money received from other investors and that there was no other source of funds from which these investor payments could have been made. Since 2008, Receivership Defendants raised at least $225 million from investors and paid out at least $175 million to investors. (Id. ¶ 17(e)-(f).) Even as early as 2008, the net operating income obtained through Receivership Defendants' limited business operations was insufficient to make payments to investors. (See id. ¶ 17(i) (comparing RRC's net-operating income to payments RRC made to investors and other RRC-affiliated businesses); Strong Report at 23–24.)

From 2008 through the appointment of the Receiver in 2018, Receivership Defendants continued to take in ever-increasing money from investors and to pay out exorbitant returns. Between January 1, 2018, and November 15, 2018, Receivership Defendants paid more than $37 million to investors. (Strong Report Ex. 25 (summarizing amounts raised from and paid to investors on a year-by-year basis).)

Receivership Defendants told investors that the Silver Pool was "no risk" because the investment was backed by physical silver, which would always have value, and that the Silver Pool paid an average return of 20–25%. (Hafen Decl. ¶ 19.) Receivership Defendants represented that returns between 2012 and 2017 exceeded 40% and, in one year, had exceeded 100%.

8

Investor statements provided by Receivership Defendants reflected that every silver trade was successful and that Receivership Defendants had never lost on a trade. (Id.)

Moreover, Receivership Defendants promoted the Silver Pool as an exclusive program offered only to those investors Rust knew personally. (Id. ¶ 20.) Receivership Defendants falsely claimed to have a trading relationship with HSBC, one of the world's largest banks, and to use a proprietary trading algorithm that allowed Receivership Defendants to beat the market. (Id. ¶ 22.) Receivership Defendants paid exorbitant returns to investors for years, creating the false impression that profits were being earned, which attracted new investors to the scheme and convinced existing investors to increase their investment. (Id. ¶ 21.)

Defendants raise several concerns regarding the evidence that the Receiver relies upon to show that the Silver Pool was a Ponzi scheme, but these concerns are not genuine disputes of material fact that preclude summary judgment. First, Defendants say they have been "deprived" of the necessary documentation for them to conduct their own analysis of the relationship between RRC and the Silver Pool Ponzi scheme. This is simply not the case, as all of the materials upon which the Receiver bases his conclusion were produced to Defendants.

Next, Defendants point out that the court has not yet entered summary judgment on the Ponzi scheme issue in the Enforcement Action. But they do not explain why summary judgment on this particular issue is only appropriate in the Enforcement Action. Indeed, the court has already entered summary judgment orders finding that the Silver Pool operated as a Ponzi Scheme in two other ancillary actions. See Hafen v. Brimley, No. 2:19-CV-00875-TC, 2021 WL 1424713, at *5 (D. Utah Apr. 15, 2021); Hafen v. Famulary et. al, No. 2:19-CV-00627-TC, 2021 WL 229356, at *3–5 (D. Utah Jan. 22, 2021). The court sees no reason why it cannot enter summary judgment in this action as well.

9

Finally, Defendants argue that the QuickBooks accounting records upon which the Receiver's experts base their analyses are unreliable because these records were instruments of fraud. The Receiver's experts never stated that the data contained in the QuickBooks could not be used to identify transactions, which is how they were used here. Rather, they observed, after extensive forensic investigation, that the QuickBooks were incomplete, and as a result a full understanding of RRC's financial condition required investigation into other records. Those investigations were in fact performed. Moreover, Defendants have not offered any evidence showing that the information relied on is unreliable. At a hearing, Defendants even acknowledged that there is "nothing missing" from the large body of evidence demonstrating that the Silver Pool was Ponzi scheme. Accordingly, the court finds that the Receivership Defendants operated the Silver Pool which constituted a Ponzi scheme since at least 2008.

## IV. There are Genuine Issues of Material Fact Regarding Defendants' Transactions with Receivership Defendants.

Although the Silver Pool was a Ponzi scheme, this does not mean that all funds received by Defendants in excess of their investment must be automatically returned to the Receivership estate. Rather, now that the Receiver has established the existence of a Ponzi scheme, the burden shifts to Defendants to show that the funds they received from Receivership Defendants were exchanged in good faith and for reasonably equivalent value.

Defendants maintain that their transactions with the Receivership Defendants were not a part of the Silver Pool and instead were part of the legitimate RRC specialty coin business. The Receiver asserts that the issue of whether the Defendants' transactions were legitimate should be decided at trial, and the court agrees. Defendants will have the opportunity at trial to prove that

10

the funds they received from Receivership Defendants were exchanged for reasonably equivalent value.

The Receiver asks the court to enter judgment establishing certain transactions between Defendants and Receivership Defendants. But contrary to the Receiver's argument, the parties' competing expert reports demonstrate a genuine issue of material fact regarding these transactions and how they are used to calculate the Defendants' net gain or loss. For instance, the Receiver says Walter and Nyla Evans had a Joint Silver Account with RRC, Ms. Evans had an Individual Silver Account, and together the Evans made a total investment contribution of $152,267.79 through both of these accounts. (Shaw Decl. ¶¶11–12 & Ex. 2-32.) In contrast, Defendants argue that there was only one Silver Pool account—the joint account—and that the correct contribution total is $163,487.05. (Johnson Report at 14; see also Defs.' Opp'n Ex. B Calculation Worksheet (ECF No. 32-2).) Next, the Receiver maintains that the Evans received a total of $328,552.27 in disbursements from RRC, while the Defendants contend the correct disbursement total is only $143,870. (Supp. Shaw Decl. ¶ 10 & Ex. 61-62; Johnson Report at 14; Calculation Worksheet.) The Receiver says that in sum, the Defendants received $176,284.48 in payments from RRC in excess of their investment with RRC, but Defendants argue that they invested $19,616.8 more than they received back. (Id.)

According to the Receiver, the Defendants' evidence shows only that there are additional relevant transactions that should be considered at trial but does not present a factual issue about whether the transactions referred to in the Receivers' motion actually occurred or the total value of those transactions. But these "additional transactions" affect the Receiver's total calculations of the Defendants' net gain or loss. For example, the Receiver asks the court to enter judgment that the Evans received $150,778.69 from the Receivership Defendants; Defendants say this

11

number should be $143,870. Although a difference of $6,908.69 may seem small in the context of the enormous Silver Pool scheme, this disparity raises a genuine issue of material fact. Furthermore, even though the court has reviewed both parties' expert reports and the corresponding evidence, the court finds it difficult to tell the difference between what the Receiver refers to as an "additional" transaction and the transactions that the Receiver seeks to have the court decide on summary judgment. For these reasons, the court finds that the transactions between Defendants and Receivership Defendants set forth in the Receivers' motion are factually disputed. Consequently, summary judgment on this issue is not appropriate.

Additionally, the parties dispute the value of 6,270 Silver Eagle coins that the Evans received on August 29, 2014, from RRC. The Receiver's expert values the coins to be worth at least $131,356.50, while Defendants' expert says they are worth $121,951.50. (Russell Decl. ¶¶ 11–15; Johnson Report at 15.) This too is a factual issue for trial. The court will not, as the Receiver suggests, determine the experts' credibility or the validity of their valuations at this stage in the proceeding.

## ORDER

For the reasons set forth, the court GRANTS IN PART the Receiver's Motion for Partial Summary Judgment (ECF No. 30) on the issue of whether the Silver Pool operated as a Ponzi scheme. The court DENIES IN PART the Receiver's Motion for Partial Summary Judgment regarding the transactions between Defendants and Receivership Defendants.

DATED this 9th day of August, 2021.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge